Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 7429 | DATE | 5/12/2003 |
| CASE TITLE | Presto, et al. vs. State of Illinois Department of Human Services, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Motion of defendant State of Illinois Department of Human Services for summary judgment [56-1] is denied. The joint pretrial materials are to be delivered to chambers by 5/19/03. The final pretrial conference and trial dates previously set will stand.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 13 2003 | |
| | Notified counsel by telephone. | | date docketed | 76 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 5/12/2003 date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DONNA PRESTO, DIANA LEFEBVRE )
and VIRGINIA MOUTON, )
 )
    Plaintiffs, )
 )
v. ) No. 00 C 7429
 ) Judge Joan H. Lefkow
STATE OF ILLINOIS DEPARTMENT )
OF HUMAN SERVICES and )
DENNIS BAILEY, )
 )
    Defendants. )

DOCKETED MAY 1 3 2003

## MEMORANDUM OPINION AND ORDER

Counts I, III, and V of this multi-count case are brought against defendant State of Illinois Department of Human Services ("IDHS") by three of its employees, Donna Presto, Diana Lefebvre and Virginia Mouton (who will be referred to herein by their surnames). Before the court is IDHS's motion for summary judgment on these claims, which are "hostile work environment" sexual harassment claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*. The motion is based on IDHS's affirmative defense that it is not liable for sexual harassment by its former employee and co-defendant, Dennis Bailey ("Bailey").[1] IDHS also rests on its affirmative defense that the doctrine of laches bars Presto's and Mouton's claims. This court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3). For the reasons set for below, the court denies the motion.

---

[1] On October 18, 2001, the court granted plaintiffs' motion for default judgment against Bailey. Plaintiffs alleged employment discrimination claims under 42 U.S.C. § 1983 (Counts I, III, V) and assault and battery claims under state law (Counts II, IV and VI) against Bailey. Mouton also alleged a false imprisonment claim under state law (Count VII) against Bailey.



## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of material fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFFS

IDHS[2] employs approximately 20,000 employees throughout the State of Illinois, including 1,000 employees at the William A. Howe Developmental Center (the "Howe Center") in Tinley Park, where the facts giving rise to this law suit took place. The Howe Center serves as

---

[2]IDHS began operations on July 1, 1997. Prior to this date, it was known as the Illinois Department of Mental Health and Developmental Disabilities.

2

a direct care facility for 480 persons who are commonly referred to as residents. The residents are developmentally disabled and have mild to profound mental retardation. One-third of the residents are also mentally ill and one-quarter of the residents have physical disabilities.

## A.  The Howe Center Operational Structure

The residents live in "houses" at the Howe Center. At all relevant times, Lefebvre, Mouton and Presto worked the night shift in the houses as Mental Health Technicians. Mental Health Technicians are responsible for "caring for, treating, and habilitating" the residents and "are not members of management." (Dukes Aff. ¶ 6.) Lefebvre worked for IDHS from 1994 until late 1999, when she took an educational leave of absence. Mouton has worked for IDHS from 1982 to present. Presto has worked for IDHS from 1988 to present. At all relevant times, Lefebvre worked part-time from 6:00 a.m. to 10:00 a.m. and Mouton and Presto worked from 11:00 p.m. to 7:00 a.m.

The Howe Center has 40 separate houses. Ten houses form a "unit." Each unit has a "Unit Director" ("UD"), who is responsible for the overall supervision of all employees within the unit. The UD may recommend that an employee be promoted, demoted, disciplined or discharged subject to the collective bargaining agreement between the Illinois Department of Central Management Services ("CMS") and the employee's union. Presto's UD from 1996 to June 1999 was Dianne Kariotis and from June 1999 thereon was Dorothy Carlson ("UD Carlson"). Lefebvre's and Mouton's UD was UD Carlson.

The UD is the direct supervisor of the "Living Unit Administrator" ("LUA"), who oversees three to four houses in a unit. IDHS represents that the LUAs are primarily responsible for assigning work to the Mental Health Technicians as well as the hiring, firing, demoting,

3

promoting and disciplining of the Mental Health Technicians. Moreover, plaintiffs acknowledge that their LUA was their "immediate supervisor" (Mouton Dep. at 23), "supervisor" (Lefebvre Dep. 46-47) and/or the individual who had the authority to hire, fire and discipline or change the work assignments of Mental Health Technicians (Presto Dep. at 47-48). Although LUAs generally work during the day, they have 24-hour responsibility over their respective houses and may be reached via pager. For Presto, her LUA was Ora Cotton from 1996 to June 1999 and Paulette Taylor ("LUA Taylor") from June 1999 thereon. Lefebvre's and Mouton's LUA was LUA Taylor from 1997 to 1999.

**B.     Bailey's job responsibilities**

Bailey began working for IDHS at the Howe Center in 1977. From 1988 to August 6, 1999, Bailey was the "Night Shift Supervisor,"[3] where he supervised Mental Health Technicians working the night shift, including plaintiffs. Bailey's supervisor was the night Administrator, who is the equivalent of a LUA. (Pl. L.R. 56.1 ¶ 5.) Louis Volpi ("Volpi") served as the night Administrator from 1995 to 1996 and Kathleen Koch ("Koch") served as the night Administrator from 1996 to 1999. The night Administrator is supervised by a UD. From approximately 1997 to July 1999, Bruce Thompson ("UD Thompson") was the UD responsible for the night Administrator and four to five Night Shift Supervisors including Bailey.

IDHS proffers that, as the lowest level supervisor at the Howe Center, Bailey was responsible only for monitoring the work activities of Mental Health Technicians, providing them with in-service training and processing their requests for supplies and materials. At the

---

[3]From 1984 to June 30, 1999, Bailey's official title was "Mental Health Supervisor." As of July 1, 1999, Bailey's title was changed to "Residential Services Supervisor," although he had the same job responsibilities.

4

request of the LUA or UD, Bailey could "counsel" a Mental Health Technician, but counseling was not considered discipline either by IDHS or under the collective bargaining agreement.

Bailey, however, could submit written staff statements, known as "write ups," regarding allegations of employee misconduct. (Def. L.R. 56.1 ¶ 71.) At issue between the parties is whether Bailey's write ups were a form of discipline; thus, making him a supervisor for Title VII purposes.[4] According to IDHS, all employees, including Bailey, are instructed to submit write ups when they perceive misconduct. (*Id.*) IDHS asserts that a write up is not discipline but instead initiates the investigative process that may result in employee discipline. (*Id.*)

Plaintiffs, however, assert that Bailey's write ups carried more weight than regular employees because one of his central responsibilities was to ensure that the night Mental Health Technicians were not sleeping on the job. If a Mental Health Technician was written up for sleeping on the job, she would receive a 15-day suspension. The second write up would result in her termination from employment.

Plaintiffs along with their co-employees perceived that LUAs would rubber stamp Bailey's write ups because the LUA worked mainly during the day and thus relied heavily, if not solely, on Bailey's supervision of the night Mental Health Technicians. For example, during Spring, 1998, a fellow Mental Health Technician, Margaret Cook ("Cook"), caught Bailey cornering Presto with his hand apparently on her breast. When Cook intervened, Bailey threatened that if they complained about this incident, "I could have both of your jobs. I could

---

[4]To determine whether Bailey was a supervisor for Title VII purposes, the court must consider whether Bailey had "the authority to *directly* affect the terms and conditions of [the plaintiffs'] employment." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (emphasis in original). "This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer." *Parkins v. Civil Constr. of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998).

5

say you're both sleeping, and you know what that would mean .... Both your asses would be out the door." (Cook Dep. at 23.) Cook testified that she believed Bailey's threats could be carried out. (*Id.*) None of the parties, however, proffered evidence as to how a LUA handled Bailey's write ups when disciplining a night Mental Health Technician.

## C. The Howe Center's sexual harassment policy

As early as 1994, IDHS had a sexual harassment policy.[5] The policy, as revised October 15, 1999, provides employees with examples of verbal, non-verbal and physical sexual harassment and states:

> Any employee who observes, or believes himself/herself to be the object of sexual harassment should address the incident(s) directly and firmly, by clearly communicating his/her position to the supervisor, the [Equal Employment Opportunity ("EEO")]/[Affirmative Action ("AA")] Officer, and the offending employee. The EEO/AA Officer will provide the reporter with the necessary instructions for addressing the situation, and for filing a complaint if such is indicated.
>
> * * *
>
> Each supervisor is responsible for maintaining a workplace free of sexual harassment by promoting a professional environment and by addressing sexual harassment directly, as with all other forms of employee misconduct.

---

[5]Plaintiffs do not dispute the existence of the above policy but argue that IDHS does not show it had such a policy prior to October 15, 1999. Although it is unclear whether the cited policy is the same as the policy in place when Bailey began to harass plaintiffs, the evidence demonstrates that IDHS had a sexual harassment policy as early as, if not before, 1994. (Volpi Dep. at 49, 52, 55; Matson Dep. at 19, 26, 71; K. Taylor Dep. at 36, 46-47.) For example, Jeanne Matson ("Matson"), the Howe Center's Chief of Investigations, testifies that she was "familiar" with the sexual harassment policy because she "read it many years ago." (Matson Dep. at 19.) Matson also testifies that "an individual could report allegations of sexual harassment to [anyone]" and that if she felt harassed, she would report it to her supervisor. (*Id.* at 26.) She further testifies,

> ... [P]olicies have been in effect for many years. I mean, the reporting policy has been in effect for a long time, and there are resources available ... for whatever reason. The employee handbook addresses sexual harassment. I don't know exactly what it states. But it addresses it and it's given to the employees. And during staff development, center figures are introduced and classes are presented on it there.

(*Id.* at 71.)

6

(Def. L.R. 56.1 ¶¶ 45-46.) As an example of how the complaint procedure works, Volpi, one of Bailey's former supervisors, testified that "the supervisor is required to investigate [sexual harassment complaints] even where the employee says that she does not want to make a formal complaint" and that he "would initiate paperwork" to refer the matter to the appropriate management official who would investigate the allegations. (Volpi Dep. at 49-50.)

IDHS proffers evidence that when it was established in July 1997, IDHS included its sexual harassment policy in its employee handbooks that were distributed to its approximately 20,000 employees throughout Illinois, including plaintiffs. (Def. L.R. 56.1 ¶¶ 2, 48-53.)[6] Moreover, IDHS asserts that, from 1994 to present, the Howe Center disseminated its sexual harassment policy by posting notices that directed employees to contact the EEO/AA officer with any complaints of discrimination or harassment and included the EEO/AA officer's name and telephone number on its notices, its paychecks to employees and in its newsletter, *The Link*.[7]

## D. Events leading to the instant law suit

In either 1992 or 1993, Bailey attended a sexual harassment seminar given by the State of Illinois where he learned that it was inappropriate to touch employees without their consent. (Bailey Dep. at 26-27.) Despite this seminar, Bailey was known to touch female Mental Health Technicians without their consent and periodically to comment to a female Mental Health

---

[6] In July 1997, plaintiffs signed and dated a "certification" form that they returned to their respective supervisors. (Def. L.R. 56.1 ¶¶ 50-53.) The certification form stated that the employee "understand[s] that compliance with the[] policies and regulations [in the handbook] is a condition of employment and that it is [the employee's] obligation to read, understand, and remain current with any new or amended policy or regulation. . . ." (*Id.* ¶ 50.)

[7] IDHS asserts that it designated several other channels to take complaints, namely, the UD, the Employee Assistance Program ("EAP") counselors, the Chief of Investigations, the Administrator on Duty, the Chief Operating Officer, the Director and the employee's union representative. Although IDHS demonstrates that these individuals would take and act on sexual harassment complaints, IDHS's policy was that employees should report sexual harassment complaints to the EEO/AA officer and/or their supervisor.

Technician on how she "looked in her outfit, that she had nice breasts, how much he liked her breasts and that she had a cute behind." (Burnham Aff. ¶ 7.) Bailey made such comments when LUA Taylor and UD Carlson were standing only a few feet away, but they did not intervene. (Pl. L.R. 56.1 ¶ 29; Burnham Aff. ¶ 17.)[8]

IDHS accepts as true for purposes of this motion that Bailey sexually harassed plaintiffs. Bailey's sexual harassment of plaintiffs went well beyond the incidents described above. In brief, Mouton was harassed approximately 450 to 500 times during the course of five years, from October 1994 to August 1999. Bailey would come to Mouton's house, touch her breasts and buttocks, and force his hands into her pants and touch her private area. He also would occasionally masturbate in front of her and force her to touch his penis until he ejaculated. Mouton would tightly tie her pants to try to prevent him from further molesting her but otherwise would comply so that she would not have to fight him. (Mouton Dep. at 99.) As for Lefebvre, throughout 1999, Bailey grabbed her breasts and reached his hand up her shorts to her underwear, almost making contact with her genital area. At one point, Lefebvre hit him with a clipboard to try to stop him. As for Presto, she testifies that she was subject to sexual harassment by Bailey during two different time periods: 1996 to 1997; and July to August 1999. Bailey would touch Presto's hair and legs. On one occasion, Presto kicked Bailey to stop him when he tried to lick her ankles.

---

[8]Not surprisingly, IDHS denies this fact, citing UD Carlson's and LUA Taylor's affidavits. (Def. Resp. to Pl. L.R. 56.1 ¶ 29.) UD Carlson attests that she never personally observed Bailey's behavior and was not made aware of his behavior until August 6, 1999. (UD Carlson Aff. ¶¶ 17, 18.) LUA Taylor attests only that "no employee has ever reported to me that they believed they were being sexually harassed by Bailey." (LUA Taylor Aff. ¶ 16.)

*1.  Presto's first attempt to report Bailey's harassment*

In either late 1996 or mid-1997, Presto reported Bailey's misconduct to Volpi. Presto told Volpi that Bailey would stay an hour or longer at her house, "get on his knees in a squatting position, put his hands on [her] knees, [and] try to move them up [her] thighs." (Def. L.R. 56.1 ¶ 110.) Presto told Volpi that she "pushed [Bailey] off of [her]," but that he would continue his conduct and would also "sometimes [put] his hands on [her] neck, like in a consoling kind of way, massaging, playing with [her] hair." (*Id.* ¶ 111.) Furthermore, as he left the house, Presto said that Bailey would stand by the front door, "flick his tongue out," and "lick his lips." (*Id.*) Presto stated to Volpi that she "didn't want any trouble," as a result of her complaint. (*Id.* ¶ 112.) Volpi responded that he would have a "man-to-man" talk with Bailey. (*Id.* ¶ 114.) Volpi also informed Presto that if Bailey should engage in the same conduct again to call Volpi immediately. (*Id.* ¶ 115.)

The following testimony is an excerpt from Volpi's deposition concerning his conversation with Bailey:

> Q. Let me ask you this, then: Did you ask Mr. Bailey what he was saying to [Presto] that could make her uncomfortable?
>
> A. I think I -- The way I presented the question to Mr. Bailey was like, What's going on? Has there been anything -- Is there anything going on that I should know about? In essence, this is what I asked him: Is there anything going on between you and Ms. Presto that I should know about for her to feel this way?
>
> Q. Did you ask him whether he said anything that could make her uncomfortable?
>
> A. No. Once he told me no, that there was nothing going on, I didn't take it any further. . . .

9

(Volpi Dep. at 105-06.) Bailey, however, testified that Volpi vaguely said that "people were having problems with" him but did not mention any names and that "[h]e may have said that if there is anything that's going on, it needs to stop." (Bailey Dep. at 111-12.) Bailey testified that he did not think Volpi's conversation was about sexual harassment but rather that employees had problems with him because of his job responsibilities. (*Id.*)

Two or three days later, Presto became aware that Volpi spoke with Bailey. (Def. L.R. 56.1 ¶ 116.) Volpi told Presto that during his conversation with Bailey, Bailey did not "deny or admit anything." (*Id.* ¶ 117.) Volpi stated to Presto, "if anything happens again, you call me immediately." (*Id.* ¶ 118.) Presto thanked Volpi for speaking with Bailey. (*Id.*) Presto testified that Bailey did not harass her again until July 1999 (and despite Cook's testimony concerning the spring 1998 incident).

2.  *Plaintiffs' collective complaint of Bailey's harassment on August 6, 1999*

On August 6, 1999, plaintiffs collectively notified Howe Center management regarding their allegations of sexual harassment by Bailey. (*Id.* ¶¶ 95, 153-54, 195.) Specifically, Lefebvre notified her on-site union president, Ira Calloway, of Bailey's harassing behavior. (*Id.* ¶¶ 153-54.) Calloway, in turn, informed UD Carlson.

UD Carlson informed the Howe Center's Chief of Investigations, Jeanne Matson ("Matson"). Matson investigates allegations and incidents of abuse or neglect of residents but also obtains statements from employees regarding employee misconduct. Matson and the EEO/AA officer took statements from plaintiffs. Matson then reported plaintiffs' allegations to the Office of the Inspector General ("OIG"), which investigates employee misconduct. (Matson Dep. at 24.) The OIG subsequently referred the matter to the Illinois State Police due to the

10

criminal nature of Bailey's misconduct.

Furthermore, UD Carlson informed UD Thompson about plaintiffs' allegations. Due to the gravity of plaintiffs' collective allegations, UD Thompson immediately placed Bailey on administrative leave. Shortly thereafter, Bailey was suspended pending discharge proceedings. On September 17, 1999, IDHS discharged Bailey. Bailey's termination papers show that IDHS terminated Bailey for conduct unbecoming of a state employee, stating, "[Y]ou have abused your authority as a supervisor by engaging in inappropriate sexual behavior with subordinate employees." (Bailey Dep. Ex. 11.)

On August 12, 1999, the Illinois State Police arrested and charged Bailey with official misconduct for committing criminal sexual assault and battery. (*Id.* Ex. 13.) Bailey's offenses were upgraded from a misdemeanor to a felony because he committed sex crimes on state property and in his position as a supervisor. (Pl. Ex. Felony Status Records.) Bailey subsequently appeared in Cook County Criminal Court, where he pled guilty to 5 counts of official misconduct and was sentenced to 30 months probation.

In November 1999, plaintiffs filed their charges of sexual harassment with the Equal Employment Opportunity Commission ("EEOC"). On November 24, 2000, plaintiffs initiated their law suit against IDHS and Bailey.

## DISCUSSION

IDHS first asserts its affirmative defense that it is not liable under Title VII for Bailey's harassment. Second, IDHS asserts its affirmative defense that Presto and Mouton are barred from bringing their claims against it under the doctrine of laches.

11

A.  **Employer liability under Title VII**

"The employer's liability in all kinds of cases is determined under agency principles, as the Supreme Court has enunciated them." *Molnar* v. *Booth*, 229 F.3d 593, 599-600 (7th Cir. 2000), citing *Burlington Indus.* v. *Ellerth*, 524 U.S. 742, 760-65 (1998), and *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807-08 (1998). If Bailey was a co-employee, then IDHS is liable if it was negligent either in discovering or remedying the harassment. *See* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."); *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 356 (7th Cir. 2002), citing *Parkins* v. *Civil Constr. of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). If, however, Bailey was a supervisor, then IDHS is strictly liable. *Parkins*, 163 F.3d at 1032.

IDHS contends that it is not liable for Bailey's harassment regardless of whether Bailey was plaintiffs' co-employee or supervisor. Plaintiffs respond that Bailey's misconduct was "so open, obvious, and persistent" that Howe Center management had to know of it, and was either negligent or strictly liable in failing to take corrective action. (Pl. Resp. at 5.) Plainly, there are disputed issues of material fact regarding co-employee liability which defeat summary judgment. And if the evidence persuades the fact finder that Howe Center management knew or should have known of the harassment prior to August 6, 1999, then whether Bailey was a supervisor for Title VII purposes, whether plaintiffs properly complained, and whether Howe Center

12

management adequately responded to plaintiffs' complaints is superfluous information.[9] Thus, the court will simply deny summary judgment and leave the question of whether Bailey was a supervisor for Title VII purposes to another day.

**B.      Whether laches bars Presto and Mouton**

IDHS argues that this court should bar Presto and Mouton from bringing their claims against it based on the doctrine of laches. Laches is an equitable doctrine "concerned principally with the fairness of permitting a claim to be enforced." *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir. 1988), quoting *Lingenfelter v. Keystone Consol. Indus.*, 691 F.2d 339, 340 (7th Cir. 1982) ("It is unlike [the statute of] limitation[s], which is based merely on time. Rather, laches is based upon changes of conditions or relationships involved with the claim."). It consists of two elements: (1) a lack of diligence by the plaintiff; and (2) prejudice to the defendant resulting from the delay. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). The plaintiff bears the burden of explaining her delay in bringing suit and, if it is excusable, then the defendant must show prejudice. *Zelazny*, 853 F.2d at 541.

Presto asserts that she delayed her law suit, at least in part, due to her initial belief that Bailey would no longer harass her after Volpi spoke with him. Indeed, Presto reported Bailey's subsequent harassment in August 6, 1999, within approximately one month after he re-initiated

---

[9]Boiled down, if Howe Center management knew or should have known of Bailey's harassment prior to when plaintiffs reported it to them but did nothing, then case law supports a finding that IDHS may be subject to employer liability. *See generally EEOC v. Indiana Bell Tel. Co.*, 256 F.3d 516, 525-26 (7th Cir. 2002) ("Doing *nothing* can never be the sort of 'reasonable' step that prevents imputation to the firm of the inferior working conditions encountered by a protected class of employees. Yet apart from a single (and futile) suspension in 1990, a sanction whose modesty is attributable to a manager's negligent failure to read [the harasser's] employment file, 'do-nothing' was the employer's *only* strategy. Even if the firm acted reasonably in not discharging [the harasser], its do-nothing approach cannot have been reasonable, which means that [the firm] is responsible for the conditions [the harasser] created in the workplace.") (emphasis in original).

13

his misconduct against her. Based on these facts, the court finds that there is a genuine issue of material fact regarding whether Presto lacked diligence.

Mouton asserts a number of reasons why she did not report Bailey, including that she never received sexual harassment training, did not know she could complain to her UD or LUA, and her fear that she would not be believed based on a prior experience where her report of another employee's misconduct turned into a potential accusation against her. Where an employer has no reason to know of the harassment and the plaintiff does not complain, she is barred from recovery. *See Shaw* v. *AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) ("the law against sexual harassment is not self-enforcing; and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.") (internal citations and quotations omitted). Here, by contrast, plaintiffs contend that the harassment was open and notorious and IDHS did nothing to bring it to an end. Thus, while Mouton's diligence under the circumstances is disputed, there is also clearly an issue of material fact as to whether Mouton's failure to report Bailey prejudiced IDHS as it argues it did. (Def. Mem. at 24, stating that IDHS "stands to suffer tremendous prejudice to the extent that it would be liable for behaviors unknown to it."; Def. Reply at 15); *see Zelazny*, 853 F.2d at 543 (determining that a defendant demonstrates prejudice from the loss of evidence, pecuniary loss and/or administrative inconvenience). For these reasons, the motion for summary judgment based on laches is denied.

## ORDER

Wherefore, for the reasons set forth above, the court denies the motion for summary judgment [#56]. The joint pretrial materials are to be delivered to chambers on Monday, May 19, 2003. The final pretrial conference and trial dates previously set shall stand.

ENTER: *Joan H. Lefkow*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: May 12, 2003